FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| VICTORIA ZETWICK,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>COUNTY OF YOLO; EDWARD G. PRIETO, Sheriff of Yolo County,<br>*Defendants-Appellees*. | No. 14-17341<br><br>D.C. No.<br>2:12-CV-02486-TLN-AC<br><br>ORDER AND OPINION |

Appeal from the United States District Court
for the Eastern District of California
Troy L. Nunley, District Court Judge, Presiding

Argued and Submitted October 18, 2016.
San Francisco, California

Filed February 23, 2017

Before: Susan P. Graber and Mary H. Murguia, Circuit
Judges, and Mark W. Bennett,[*] District Judge.

Opinion by Judge Bennett

---

[*] The Honorable Mark W. Bennett, United States District Judge for
the Northern District of Iowa, sitting by designation.

## SUMMARY[**]

### Employment Discrimination

The panel filed (1) an order recalling the mandate, granting a request for publication, and redesignating a memorandum disposition as an authored opinion with modifications, and (2) an opinion reversing the district court's summary judgment in favor of the defendants in an action under Title VII and the California Fair Employment and Housing Act.

A county correctional officer alleged that the county sheriff created a sexually hostile work environment. The panel held that a reasonable juror could conclude that differences in the sheriff's hugging of men and women were not, as the defendants argued, just "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and the opposite sex." In addition, the district court's contrary conclusion may have been influenced by application of incorrect legal standards. The panel held that hugging can create a hostile or abusive workplace when it is unwelcome and pervasive, and summary judgment on a hostile work environment claim is appropriate only if the defendant's conduct was neither severe nor pervasive enough to alter the conditions of the plaintiff's employment. The panel remanded the case to the district court for a trial on the merits of the plaintiff's federal and state sexual harassment claims and her state claim of failing to prevent sexual harassment.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Manolo Olaso (argued)  and Johnny L. Griffin, III, Law Offices of Johnny L. Griffin III, Sacramento, California, for Plaintiff-Appellant.

John A. Whitesides (argued), Cori R. Sarno, and Carolee G. Kilduff, Angelo Kilday & Kilduff LLP, Sacramento, California, for Defendants-Appellees.

**ORDER**

Appellant's request for publication is **GRANTED**.  The mandate issued December 2, 2016, is recalled.

The memorandum disposition filed November 9, 2016, is redesignated as an authored opinion by Judge Bennett with modifications.

**OPINION**

BENNETT, District Judge:

Plaintiff Victoria Zetwick, a county correctional officer, alleges that defendant Edward G. Prieto, the county sheriff, created a sexually hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the California Fair Employment and Housing Act (FEHA), CAL. GOV'T CODE § 12900 *et seq*., by, among other things, greeting her with unwelcome hugs on more than one hundred occasions, and a kiss at least once, during a 12-year

period. The defendants, Prieto and the County of Yolo, argue that such conduct was not objectively severe or pervasive enough to establish a hostile work environment, but merely innocuous, socially acceptable conduct. The district court granted the defendants' motion for summary judgment, and Zetwick appeals. We reverse and remand.

## I. INTRODUCTION

### A. Factual Background

Zetwick began her employment with the Yolo County Sheriff's Department in 1988 as a correctional officer. She was promoted to sergeant in 2002. In 1999, Edward G. Prieto was elected as the county sheriff. He was in charge of a sheriff's office with approximately 250 employees, including the correctional officers. The defendants acknowledge that, after his election, Prieto introduced himself to the corrections staff and hugged all the female officers present, including Zetwick. Zetwick contends that, thereafter, from 1999 to 2012, Prieto subjected her to numerous unwelcome hugs and at least one unwelcome kiss that, taken as a whole, created a sexually hostile work environment.

Zetwick estimates that, from about 1999 to 2002, Prieto hugged her at least two dozen times and that, between 2003 and 2011, Prieto hugged her at least a hundred times. The defendants dispute the number and frequency of the hugs. They point out that, during 2000, Zetwick worked the night shift and rarely, if ever, encountered Prieto, whose office was not in the jail; during 2001, Zetwick worked in the courthouse holding facility and saw Prieto only occasionally; and, in 2002, after Zetwick was promoted and returned to the night shift, Prieto visited the jail perhaps once and hugged her. The

defendants contend that most of the incidents in which Prieto hugged Zetwick were at parties involving sheriff's office employees, awards banquets, GED graduations for prisoners, and some training sessions or meetings, but no incidents when Prieto and Zetwick were alone.

In one particular incident, in May 2003, at an awards ceremony, Prieto kissed Zetwick, ostensibly to congratulate Zetwick on her recent marriage to a sheriff's deputy. The kiss landed on or, because Zetwick turned her head, partially on the lips. Zetwick states that she expressed her shock at this incident to her husband, co-workers, and supervising lieutenants, but not to Prieto. Her supervising lieutenants did not forward her complaints for investigation or resolution. Zetwick contends that, over the years, her co-workers and supervising lieutenants teased her that Prieto was going to kiss her on the lips. She contends that, on another occasion, in 2010, when she was working in the booking area with another female sergeant named Malugani, Prieto approached Zetwick, reached out to hug her, then stopped himself, and told her that people had complained, so he would not give her a hug. He then promptly hugged both Zetwick and Malugani anyway. Zetwick avers that the last hug that Prieto gave her was in December 2011. The defendants point out that Prieto first became aware of Zetwick's dislike of his hugs when she filed her administrative claim in early 2012.

Zetwick also contends that, from 1999 to 2013, she saw Prieto hug and kiss several dozen other female employees, but did not see him hug male employees. Rather, she observed that Prieto gave male employees handshakes. She also details an incident in which Prieto repeatedly asked Malugani how much Mulagani weighed, until Malugani answered. Zetwick contends that, during this incident, Prieto

stared at Malugani's body in a sexually suggestive manner and that Zetwick believed that Malugani was embarrassed and uncomfortable. The defendants counter that Malugani stated in a declaration that she was embarrassed, because her weight loss was from a health problem, but that she was not offended by Prieto's questions or hugs. The defendants also contend that even Zetwick described Prieto's hugs as the kind that one might give a relative or friend, lasting only a couple of seconds, and not involving sexual comments or other touching. Zetwick contends that the hugs were, nevertheless, chest to breasts. The defendants contend that, even if Zetwick did not see it, Prieto also hugged male employees on occasion. They add that Zetwick admits that she also hugged male co-workers and occasionally joined in banter about Prieto's hugs.

Zetwick contends that her workplace changed, and that she found it difficult to concentrate, because of Prieto's conduct, in that she was constantly stressed and anxious about Prieto's touching, which she believed had sexual overtones. She testified in a deposition that she sometimes cried at work, in the locker room, because of stress from Prieto's conduct, that she lost sleep, and that she had to take sleep aids because of her anxiety.

### B. Procedural Background

After exhausting administrative remedies, Zetwick filed suit on October 3, 2012, against the County of Yolo, Prieto, and Does 1 through 50. She asserted claims of sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, against the County and Does 1 through 50; sexual harassment in violation of the California Fair Employment and Housing Act (FEHA), CAL. GOV'T

CODE § 12900 *et seq.*, against all defendants; and failure to prevent sexual harassment, in violation of the FEHA, CAL. GOV'T CODE § 12940(k), against the County and Does 1 through 50. Zetwick sought compensatory, general, and special damages, punitive and exemplary damages, costs and attorney's fees, and such other relief, including injunctive and/or declaratory relief, as the court might deem appropriate. The County and Prieto filed a joint Answer on November 16, 2012, denying Zetwick's claims and asserting various affirmative defenses.

On October 3, 2013, the County and Prieto filed a Motion for Summary Judgment. Zetwick filed her Opposition on October 17, 2013, and the defendants filed their Reply on October 24, 2013. The district court heard oral arguments on the defendants' Motion for Summary Judgment on October 31, 2013. Just over a year later, on November 6, 2014, the district court granted the defendants' Motion for Summary Judgment, dismissed Zetwick's claims, and directed the Clerk of Court to close the case. *Zetwick v. Cty. of Yolo*, 66 F. Supp. 3d 1274 (E.D. Cal. 2014). Judgment was entered accordingly on November 6, 2014. Zetwick timely filed her Notice Of Appeal on November 24, 2014. We have jurisdiction under 28 U.S.C. § 1291.

## II.  LEGAL ANALYSIS

### A.  Summary Judgment Standards

Our review of a summary judgment ruling is de novo. *Animal Legal Def. Fund v. FDA*, 836 F.3d 987, 988 (9th Cir. 2016) (en banc) (per curiam). The standard for summary judgment is familiar: "Summary judgment is appropriate when, viewing the evidence in the light most favorable to the

nonmoving party, there is no genuine dispute as to any material fact." *See, e.g.*, *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016) (internal quotation marks omitted). This statement does not fully explain the role of the courts at summary judgment, however.

As to that, the Supreme Court recently reiterated:

> [C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. *See Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004) (per curiam ); *Saucier [v. Katz*, 533 U.S. 194,] 201 [(2001)]; *Hope [v. Pelzer*, 536 U.S. 730,] 733 n.1 [(2002)]. This . . . is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson [v. Liberty Lobby, Inc.]*, 477 U.S. [242,] 249 [(1986)].

*Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam). It is also clear that the court must not make any credibility determinations. *Anderson*, 477 U.S. at 255; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (explaining that the standard for summary judgment "mirrors" the standard for judgment as a matter of law).

Similarly, the district court must recognize that, where evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that "issue is inappropriate for resolution on summary judgment." *Direct Techs., LLC  v.*

*Elec. Arts, Inc.*, 836 F.3d 1059, 1067 (9th Cir. 2016); *Pan Pac. Retail Props., Inc. v. Gulf Ins. Co.*, 471 F.3d 961, 970 (9th Cir. 2006) ("[T]he district court erred in granting summary judgment to the defendants, resolving [an] issue in light of the disputed and conflicting evidence before it."). To put it another way, "where the district court has made a factual determination, summary judgment cannot be appropriate." *Animal Legal Def. Fund*, 836 F.3d at 990. The proper question for the district court is whether, viewing the facts in the non-moving party's favor, summary judgment for the moving party is appropriate. *See Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1207 (9th Cir. 2016) ("We express no view on whether [the plaintiff] was actually sexually harassed or harassed on the basis of her sex, but hold that viewing the facts in her favor, the district court erred in dismissing [the plaintiff's] hostile work environment claim."), *cert. denied*, 2017 WL 69195 (U.S. Jan. 9, 2017) (No. 16-302).

In short, what is required to defeat summary judgment is simply evidence "such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Reza v. Pearce*, 806 F.3d 497, 505 (9th Cir. 2015) (internal quotation marks omitted); *accord Anderson*, 477 U.S. at 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."). On the other hand, the Supreme Court has made clear: "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The district court must not only properly consider the record on summary judgment, but must consider that record in light of the "governing law." *Anderson*, 477 U.S. at 248; *Animal Legal Def. Fund*, 836 F.3d at 989 (appellate review of a summary judgment ruling involves, *inter alia*, "decid[ing] whether the district court correctly applied the relevant substantive law"). Thus, where application of incorrect legal standards may have influenced the district court's conclusion, remand is appropriate. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

## B.  *Zetwick's Sexually Hostile Work Environment Claim*

The "governing law," *see Anderson*, 477 U.S. at 248, requires Zetwick to generate genuine issues of material fact that Prieto's conduct "was sufficiently severe or pervasive to alter the conditions of [Zetwick's] employment and create an [objectively] abusive working environment." *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007) (internal quotation marks omitted); *see id.* (identifying the elements of a prima facie case of a sex-based hostile work environment (internal quotation marks omitted)); *accord Geo Grp., Inc.*, 816 F.3d at 1206 ("An employer is liable under Title VII for conduct giving rise to a hostile environment where the employee proves (1) that he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (internal quotation marks omitted)).[1] We hold

---

[1] Essentially the same legal analysis applies to Zetwick's hostile work environment sexual harassment claims under the FEHA as federal courts apply to Title VII claims. *Brooks v. City of San Mateo*, 229 F.3d 917, 923

that, giving the record proper consideration, a reasonable juror could conclude that the differences in hugging of men and women were not, as the defendants argue, just "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). Thus, summary judgment was inappropriate. *Reza*, 806 F.3d at 505. We also hold that the district court's contrary conclusion may have been influenced by application of incorrect legal standards. *Harris*, 510 U.S. at 23.

### 1.  *Application of incorrect legal standards*

The first incorrect legal standard the district court applied involved extraction of a sort of black letter rule, from just a few cases, that courts do not consider hugs and kisses on the cheek to be outside the realm of common workplace behavior. *Zetwick*, 66 F. Supp. 3d at 1280–81. In support of this proposition, the district court cited three cases: *Lefevre v. Design Prof'ls Ins. Cos.*, No. C 93-20720 RPA, 1994 WL 514020 (N.D. Cal. Sept. 15, 1994); *Graves v. City of Durant*, No. C 09-0061, 2010 WL 785850 (N.D. Iowa Mar. 5, 2010); and *Joiner v. Wal-Mart Stores, Inc.*, 114 F. Supp. 2d 400, 409 (W.D.N.C. 2000). None of these decisions states or properly stands for that proposition. Furthermore, none identified either the number of times or the period of time over which

(9th Cir. 2000). Therefore, like the district court, we will focus on Title VII standards.

unwelcome hugging occurred; they are factually distinguishable.**[2]**

This is particularly true of the decision in *Joiner*, which states that the plaintiff complained "that he was subjected to unwanted propositions and hugs and kisses from female coworkers," but does not indicate the frequency or period of time over which such conduct occurred. 114 F. Supp. 2d at 407–09. What makes the decision in *Joiner* more interesting, however, is that the district court stated only that flirting, hugging, and even kissing in the workplace "are very ordinary things that people do and are not *per se* intimidating, hostile, humiliating, or offensive." *Id.* at 409. The court then recognized that "[i]t is only when such conduct is both unwelcome and pervasive that [it] become[s] unlawful." *Id.* Thus, *Joiner* does not state a black letter rule that hugging cannot create a hostile or abusive workplace. Rather, it actually recognizes that such conduct *can* create a hostile or abusive workplace, when "[i]t is . . . unwelcome and pervasive." *Id.*

---

**[2]** Indeed, in *Lefevre*, the court confusingly states that the plaintiff alleged that the harasser "forced her to shake hands with him each time they met and would *frequently hug* her at business meetings where [the plaintiff] was the only women [sic] in attendance," but then dismisses the plaintiff's complaints as inadequate to create an objectively hostile work environment, because "[f]requent handshakes and *occasional hugs* at business meetings do not amount to pervasive harassment." 1994 WL 514020, at *3 (emphasis added). The decision in *Graves* gives no indication of the frequency of the unwelcome hugging at issue. *See* 2010 WL 785850, at *3 (referring to "being leaned into, touched or hugged," but without indicating the frequency or period of time over which such conduct occurred); *id.* at *11 (again referring to "unwanted leaning, touching, or hugging," without indicating the frequency or period of time over which such conduct occurred).

The district court also applied an incorrect legal standard when it "f[ound] that Defendant Prieto's conduct in this case was not severe *and* pervasive." *Zetwick*, 66 F. Supp. 3d at 1285 (emphasis added). The proper standard, however, is whether the defendant's conduct was "severe *or* pervasive." *Geo Grp., Inc.*, 816 F.3d at 1206 (emphasis added). Summary judgment is appropriate only if the conduct was "*neither* severe *nor* pervasive enough to alter the conditions of [Zetwick's] employment." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 799 (9th Cir. 2003) (emphasis added). We do not dismiss this mistake as simply a typographical error, notwithstanding that the district court properly stated the requirement as "severe or pervasive" elsewhere in its decision. The incorrect statement of the legal standard occurred precisely where the district court made the pertinent *finding* that Zetwick had not met the standard. *Zetwick*, 66 F. Supp. 3d at 1285.

We conclude that the application of these incorrect legal standards may have influenced the district court's decision to grant summary judgment. *Harris*, 510 U.S. at 23.

## 2.  *Improper analysis of the record*

Turning to the district court's analysis of the record, on de novo review, *Animal Legal Def. Fund*, 836 F.3d at 988, we cannot accept the conclusion that Zetwick did not state an actionable claim of a sexually hostile work environment. "To be actionable under Title VII, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Geo Grp., Inc.*, 816 F.3d at 1206 (internal quotation marks omitted). A reasonable juror could credit Zetwick's

testimony that Prieto's conduct "was sufficiently severe or pervasive to alter the conditions of [Zetwick's] employment and create an [objectively and subjectively] abusive working environment." *Craig,* 496 F.3d at 1055. This is so, where her testimony is that Prieto hugged her more than one hundred times over the period from 1999 to 2012, that he hugged female employees much more often than male employees and, indeed, from Zetwick's observations, he hugged female employees exclusively. Because a reasonable juror could find in Zetwick's favor, summary judgment was inappropriate. *Reza*, 806 F.3d at 505.

More specifically, while it may appear that Prieto's hugs were "common" in the workplace, and that some other cross-gender hugging occurred, neither of those things demonstrates beyond dispute that Prieto's hugging was within the scope of "ordinary workplace socializing." A reasonable juror could find, for example, from the frequency of the hugs, that Prieto's conduct was out of proportion to "ordinary workplace socializing" and had, instead, become abusive. *See Geo Grp., Inc.*, 816 F.3d at 1206 (citing factors relevant to the determination of whether the environment was sufficiently hostile or abusive, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" (internal quotation marks omitted)). This is so, at least in part, because it is not possible to determine whether the environment was "hostile or abusive" without considering *the cumulative effect of the conduct at issue* to determine whether it was sufficiently "severe or pervasive" to alter the conditions of the workplace. *Id.* at 1207.

Instead of giving proper consideration to the cumulative effect of the conduct at issue, the district court attempted to apply "a mathematically precise test" to determine whether or not Zetwick had generated genuine issues of material fact that the environment created by Prieto's hugging was sufficiently hostile. *See Harris*, 510 U.S. at 22–23 (rejecting such a test). The district court stated: "While both parties acknowledged that the frequency of the interactions varied, simple math indicates that Plaintiff experienced this conduct an average of around seven or eight times per year for a couple [of] seconds on each occurrence," the encounters were not "on a daily basis," "most . . . occurred outside of normal work hours," and the encounters were not physically threatening or humiliating. *Zetwick*, 66 F. Supp. 3d at 1285. The district court correctly conceded that there was no "magic number of harassing incidents" that would give rise to liability. *Id.* In any event, there remain disputes concerning how many hugging incidents there were; whether or not the hugs were concentrated during certain periods of Zetwick's employment, when she was on certain shifts, resulting in periods of relatively high frequency hugging, or spread evenly or "sporadically" over the entire 12-year period; and what percentage of the times the two met that Prieto hugged Zetwick.

The district court erred in concluding as a matter of law that, "[b]ased on the totality of the circumstances[,] Defendant Prieto's conduct did not create a severe or pervasive work environment with respect to Plaintiff." *Id.* at 1285–86. We conclude that the district court had *not* properly considered the totality of the circumstances, however. For example, the district court failed to consider whether a reasonable juror would find that hugs, in the kind, number, frequency, and persistence described by Zetwick,

create a hostile environment. Zetwick relies, in part, on *Alvarado v. Federal Express Corp.*, 384 F. App'x 585, 589 (9th Cir. 2010) (unpublished), in which we noted that the hugging included chest to breast contact, which a reasonable juror (and a reasonable woman) could find created a hostile environment. *Alvarado* suggests that the hugs to which Zetwick was subjected raise a jury question on the objective abusiveness of the environment. In addition, Zetwick is correct "that a hostile work environment is ambient and persistent, and that it continues to exist between overt manifestations." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 n.1 (9th Cir. 1998). This is yet another reason why simply looking at the number of hugs over the period of time did not adequately address whether Zetwick had generated genuine issues of material fact that the environment she faced was sexually hostile.

The district court also completely overlooked legal recognition of the potentially greater impact of harassment from a supervisor and, indeed, the highest ranking officer in the department. The Supreme Court has recognized that "acts of supervisors have greater power to alter the environment than acts of coemployees generally." *Faragher*, 524 U.S. at 805. Indeed, the Court has recognized that "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998). Thus, Prieto's position as Zetwick's supervisor was significant to whether or not a reasonable juror could find the hugs and the kiss to which Zetwick was subjected created an abusive environment.

The district court also overlooked the import of its observation that Zetwick had stated in a deposition that it was difficult for her to go to work and that she was always

stressed, suffered from anxiety, and took a sleep aid, which the district court conceded "[c]ertainly [would] interfere with an individual's job." *Zetwick*, 66 F. Supp. 3d at 1284. This concession suggests that a reasonable juror would have an evidentiary basis to find that Zetwick's environment was abusive. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008) ("A working environment is abusive if hostile conduct pollutes the victim's workplace, *making it more difficult for her to do her job*, to take pride in her work, *and to desire to stay on in her position*." (emphasis added) (internal quotation marks omitted)).

It was also improper for the district court to disregard Zetwick's evidence that Prieto hugged and kissed other women. Zetwick argues that such evidence helps to generate genuine issues of material fact that the environment was objectively hostile. We have long recognized that "[t]he sexual harassment of others, if shown to have occurred, is relevant and probative of [a defendant's] general attitude of disrespect toward his female employees, and his sexual objectification of them." *Heyne v. Caruso*, 69 F.3d 1475, 1479–81 (9th Cir. 1995); *see also Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005) (concluding that evidence that other women were harassed showed that hostility pervaded the workplace and helped show that it was hostile).

As to one specific incident of Prieto's conduct towards other women, the district court observed that Zetwick's description of the incidents involving Malugani "do[] not survive factual scrutiny in discovery," in light of Malugani's declaration. *Zetwick*, 66 F. Supp. 3d at 1283. It was improper for the district court to determine that Zetwick's testimony that Malugani was embarrassed by Prieto's

questions and hugs, based on her firsthand observation of the incident, was necessarily less credible than Malugani's assertion, in her *post hoc* declaration, that she was embarrassed about her weight loss, but not by Prieto's questions and hugs. A reasonable juror could conclude that Malugani had reasons not to complain about past treatment by her employer and to make a declaration, not subject to cross-examination, to support her employer's position. This was the sort of conflict in the testimony that makes resolution of the issue at summary judgment inappropriate. *Direct Techs., LLC*, 836 F.3d at 1067. This conflict cannot be ignored, because it is not clear that one of the versions of the incident "is blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Finally, the defendants assert that the record shows that Prieto also hugged men, but they do not suggest that Prieto hugged men as often as he hugged women. Zetwick has submitted evidence that she never saw Prieto hug men and evidence that others agreed that Prieto hugged women more frequently than men. Thus, she submitted evidence from which a reasonable juror could conclude that, even if Prieto also hugged men on occasion, there were "qualitative and quantitative differences" in the hugging conduct toward the two genders. *Geo Grp., Inc.*, 816 F.3d at 1207 n.12 (internal quotation marks omitted). The offensive conduct does not have to be "facially sex-specific." *Id.* (internal quotation marks omitted).[3]

---

[3] The defendants argue that the hugging to which Zetwick was subjected was "friendly" and "socially acceptable" and that Zetwick has "exaggerated the evidence." These arguments rely on *weighing* of the evidence, which is not appropriate at the summary judgment stage of the

### III.  CONCLUSION

We reverse the grant of summary judgment in favor of the defendants and remand for a trial on the merits of Zetwick's federal and state sexual harassment claims and her state claim of failing to prevent sexual harassment.

**REVERSED and REMANDED.**

---

proceedings, *see Tolan*, 134 S. Ct. at 1866; *Geo Grp., Inc.*, 816 F.3d at 1207, even if such arguments may be presented to a jury.